**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
UNITED STATES OF AMERICA, :
:
    -v.- : 18-CR-835 (OTW)
:
IVAN NIEVES, : **OPINION**
:
               Defendant. :
:
:
---------------------------------------------------------------x

**ONA T. WANG, United States Magistrate Judge:**

Ivan Nieves ("Defendant") has been charged with vandalism, in violation of 36 C.F.R. § 2.31 (a) (3) (the "Vandalism Regulation"), and disorderly conduct, in violation of 36 C.F.R. § 2.34 (a) (2) (the "Disorderly Conduct Regulation"). *See* ECF 1 (Information). The charges arise out of an incident on November 19, 2018, when Defendant allegedly approached the African Burial Ground National Monument in Lower Manhattan and, using a marker, wrote the words "Kill   N-----s" on one of the monument's signposts.

Presently before the Court is Defendant's Motion to Dismiss the Information on the grounds that (1) the alleged conduct does not violate the Vandalism Regulation as a matter of law, and alternatively, that the Vandalism Regulation, both facially and as applied, violates the First Amendment; (2) the Disorderly Conduct Regulation, as applied, violates the First Amendment; and 3) both regulations are unconstitutional delegations of Congress's legislative powers. (ECF 18). For the reasons set forth below, Defendant's Motion to Dismiss is DENIED.

I.  **Legal Standard**

"A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12 (b) (1). A court can resolve a dispute "without trial of the general issue" when the motion is made solely upon an issue of law. *See United States v. Aleynikov,* 676 F.3d 71, 75–76 (2d Cir. 2012) ("[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute."); *United States v. Heicklen*, 858 F.Supp.2d 256, 262 (S.D.N.Y. 2012).

In considering whether to dismiss an information, "the Court accepts all pertinent allegations as true." *Heicklen*, 858 F.Supp.2d at 263 (citing *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n. 16 (1952) and *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985)). "Contrary assertions of fact . . . will not be considered." *Goldberg,* 756 F.2d at 950. An information need only include "a plain, concise, and definite written statement of the essential facts constituting the offense charged," Fed. R. Crim. P. 7 (c) (1), and is sufficient if it "charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992); *see Hamling v. United States*, 418 U.S. 87, 117 (1974).

II. **Analysis**

   a. **Constitutionality of the Regulations**

Because the Court does not reach the application of the regulations to Defendant unless the regulations are constitutional, the Court first considers Defendant's argument that both regulations violate the nondelegation doctrine.

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., Art. 1, § 1. It is well established that Congress generally cannot delegate its legislative power to another branch of government. *Mistretta v. United States*, 488 U.S. 361, 372 (1989) ("[T]he integrity and maintenance of the system of government ordained by the Constitution mandate that Congress generally cannot delegate its legislative power to another Branch."); *Loving v. United States,* 517 U.S. 748, 758 (1996) ("The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress . . . and may not be conveyed to another branch or entity.").

However, the Supreme Court has recognized that "the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches." *Mistretta*, 488 U.S. at 372. Congress may delegate authority to a coordinate branch when it "lay[s] down by legislative act *an intelligible principle* to which the person or body authorized to [exercise the delegated authority] is directed to conform." *Id.* (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)) (emphasis added). A delegation of legislative power is constitutionally sufficient if Congress "clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Id.* at 372-73.

Here, Defendant argues that Congress has not provided the Secretary of the Interior with an "intelligible principle" on what National Park Service regulations the Secretary is authorized to enact, rendering the delegation of legislative authority and the creation of the Vandalism and Disorderly Conduct Regulations unconstitutional. The only court to consider such an argument relating to certain National Park Service regulations found them to be

constitutional, and this Court finds its reasoning persuasive. *See United States v. Brown*, 364 F.3d 1266, 1274 (11th Cir. 2004) ("Congress has provided the Secretary with sufficient standards for the legislated authority by instructing the National Park Service, acting through the Secretary, to 'promote and regulate' national parks 'by such means and measures as to conform to the fundamental purpose of the said parks.'").

As the Eleventh Circuit found in *Brown*, Congress has provided an "intelligible principle" to which the National Park Service, acting through the Secretary of the Interior, is directed to conform. *Brown*, 364 F.3d at 1274; *Mistretta*, 488 U.S. at 372. Congress defined a general policy and designated the public agency to apply that policy when it instructed the Secretary, acting through the Director of the National Park Service, to:

> 'promote and regulate the use of the National Park System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 USCA § 100101 (a). Further, Congress clearly delineated the boundaries of the delegated authority. Congress gave the Secretary of the Interior the authority to "prescribe such regulations as the Secretary considers necessary or proper for the use and management of System units." 54 U.S.C. § 100751 (a). The Secretary's authority is limited geographically to "System units" and must "conform to the fundamental purpose of the System units, which, again, is to prescribe such regulations as are "necessary and proper" "to conserve . . . and to provide for the enjoyment of the scenery, natural and historic objects" of the System units of the National Park Service. 54 USCA § 100101 (a).

The Vandalism and Disorderly Conduct Regulations at issue do not exceed the legislative grant of authority conferred in 54 U.S.C. § 10071 (a). Both regulations are plainly consistent with and promote the enumerated purpose behind Congress's delegation of authority to the Secretary. Protecting the parks from vandalism conserves the "scenery, natural and historic objects" of the parks and ensures that they remain "unimpaired for the enjoyment of future generations." 54 USCA § 100101 (a). Similarly, prohibiting disorderly conduct promotes visitors' "enjoyment of the scenery, natural and historic objects" of the parks. *Id*.

Additionally, no rule exists absolutely barring Congress's delegation of authority to define criminal punishments. Congress may delegate the power to define by regulation what conduct is criminal "so long as Congress makes the violation of regulations a criminal offense and fixes the punishment, and the regulations 'confin[e] themselves within the field covered by the statute.'" *Loving*, 517 U.S. at 768 (quoting *United States v. Grimaud*, 220 U.S. 506, 518 (1911) and citing *Touby v. United States*, 500 U.S. 160 (1991)).

Here, the Secretary's authority to define by regulation what conduct is criminal in the national parks is proper because Congress, not the Secretary or the National Park Service, made it a misdemeanor to violate a regulation authorized by 54 U.S.C. § 100751. 18 U.S.C. § 1865 (a); *see United States v. Grace,* 778 F.2d 818, 822-23 (D.C. Cir. 1985) (rejecting separation of powers argument; "[i]t is not the Park Service but the Congress that has criminalized violations of the Park Service regulations"); *United States v. Hymans*, 463 F.2d 615, 617-618 (10th Cir. 1972) (upholding Secretary of Agriculture's promulgation of regulations prohibiting indecent conduct in national forests); *McMichael v. United States*, 355 F.2d 283, 284-286 (9th Cir. 1965)

(upholding Secretary of Agriculture's promulgation of regulations making it a misdemeanor to operate motorized vehicles in certain areas of national forests).

Therefore, because Congress "set out the Secretary's powers and duties, announced intelligible principles, and created the penalties to be imposed for violations of the Secretary's rules and regulations," the Court finds no unconstitutional delegation in this case. *See Brown*, 364 F.3d at 1276.

### b. Vandalism (36 C.F.R. § 2.31 (a) (3))

Defendant is charged with "[d]estroying, injuring, defacing, or damaging property or real property." 36 C.F.R. § 2.31 (a) (3). The Information specifically charges Defendant with "defac[ing] a signpost." (ECF 1). On this Count, Defendant argues: 1) his alleged conduct, accepted as true, does not violate the regulation; and 2) were the regulation to prohibit Defendant's conduct, the regulation would violate the First Amendment.

Defendant's first argument is one of statutory interpretation. He argues that his conduct does not fall within the scope of the regulation because the definition of "deface" does not cover something that is instantly removable. The Court disagrees.

In construing the language of the Vandalism Regulation, the Court begins with the "fundamental principle of statutory construction that the starting point must be the language of the statute itself." *U.S. v. Davila*, 461 F.3d 298, 302 (2d Cir. 2006) (quoting *Morenz v. Wilson-Coker*, 415 F.3d 230, 234 (2d Cir. 2005)); *see also In re Edelman*, 295 F.3d 171, 177 (2d Cir. 2002) ("Where the statutory terms are clear, our inquiry is at an end."). Because the regulation does not define the word "deface," the Court gives the word its "ordinary, contemporary, common meaning." *Edelman*, 295 F.3d at 177. According to the Oxford English Dictionary, to deface

means "[t]o mar the face, features, or appearance of; to spoil or ruin the figure, form, or beauty of; to disfigure." Black's Law Dictionary, Tenth Edition, defines the word as "[t]o mar or destroy . . . by obliteration, erasure, or superinscription; to spoil the surface or appearance of . . . [t]o mar or injure (a building, monument, or other structure)." The Court does not read these definitions as implying an element of permanence, excluding, as Defendant argues, conduct that is "instantly removable." Writing *on the face* of a monument necessarily "mars the face, features, or appearance of" and "spoils or ruins the features of" such monument for the time the writing is present. Curability is irrelevant. It is Defendant's *physical marking* of the monument that amounts to defacement.

Additionally, characterizing Defendant's conduct as defacement is consistent with other case law considering the definition of that word. *See e.g., Mahoney v. Doe*, 642 F.3d 1112, 1119 (D.C. Cir. 2011) (affirming decision that defacement statute applies to use of chalk and reasoning "[i]t is true, the defacement at issue is temporary and can be cured . . . [t]he government can proscribe even temporary blight"); *Lederman v. Giuliani*, No. 98 Civ. 2024, 2001 WL 902591, at *6-7 (S.D.N.Y. Aug. 7, 2001), *aff'd* 2003 WL 21664300 (2d Cir. July 15, 2003) (provision making it unlawful "to deface any street by painting, printing or writing thereon" applies to chalk); *United States v. Mutari*, No. 5:07-CR-387, 2007 WL 3046746, at *4 (N.D.N.Y. Oct. 16, 2007) ("Government counsel is correct . . . that chalking a sidewalk can be interpreted as "defacement"). Accordingly, Defendant's alleged conduct, accepted as true, properly constitutes defacement in violation of the Vandalism Regulation.

Addressing Defendant's next argument, the Court does not see any potential First Amendment problems with the Vandalism Regulation, whether as applied to Defendant or as a

facial challenge on the ground that the regulation is overbroad. The Vandalism Regulation, as applied to Defendant's conduct, does not violate his First Amendment rights. While true that the Vandalism Regulation may prohibit some forms of expressive conduct (i.e., writing, marking, painting), "when speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376-77 (1968). In a traditional public forum, such as the property at issue here, the government may enforce reasonable time, place, and manner regulations, provided the regulations are "content-neutral, [] narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *United States v. Grace*, 461 U.S. 171, 177 (1983).

Here, the Vandalism Regulation is indisputably content-neutral and viewpoint-neutral. It prohibits certain conduct ("destroying, injuring, defacing, or damaging property") without reference to the message the speaker wishes to convey. The Government has a substantial interest in protecting the physical security of government property and advancing esthetic values. *See Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 790 (1984) (government has "a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression"); *Marcavage v. City of New York*, 689 F.3d 98, 104 (2d Cir. 2012) (government has "a significant interest in keeping its public spaces safe"); *Mahoney*, 642 F.3d at 1118 ("District's interest in controlling the esthetic appearance of the street in front of the White House is substantial"). This interest is especially important here "where the special nature of the forum," a national monument, "serves to heighten esthetic concerns." *Mahoney*,

642 F.3d at 1118. Further, the Vandalism Regulation is narrowly tailored to advance this interest, curtailing no more speech than is necessary to accomplish its purpose of protecting the property and advancing esthetic values. Alternative avenues of communication remain. "It is the tangible medium—[marking]—that creates the very problem the Defacement Statute seeks to remedy." *Id.* Only expressive conduct that would constitute defacement is prohibited, and "[n]o one has a First Amendment right to deface government property." *Id.* at 1122 (Kavanaugh, J., concurring).

    Defendant's facial challenge fails for substantially the same reasons. To prevail on a facial challenge, Defendant must show that the Vandalism Regulation is "substantially overbroad, which requires the court to find a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court." *N.Y. State Club Ass'n. v. City of New York*, 487 U.S. 1, 11 (1988) (internal quotations omitted). However, Defendant cites no prior examples of the application of this regulation to protected speech, and his hypotheticals are simply inapposite. No reasonable fact finder could find that an individual wearing an ugly sweater in front of a monument "defaces" that monument. Nor would any verbal communication, alone, constitute defacement. Had Defendant, for example, stood in front of the monument and spoken the words attributed to him, his conduct would not "deface" the monument. As noted above, Defendant's conduct constitutes defacement because he *physically marked* the monument. The content of the

speech is irrelevant. Indeed, writing "Kilroy was here"[1] on the monument would also deface the monument and violate the Vandalism Regulation. Thus, Defendant has not shown a "realistic danger" that the Vandalism Regulation chills constitutionally protected speech. *Id*.

### c. Disorderly Conduct (36 C.F.R. § 2.34 (a) (2))

Defendant is charged with disorderly conduct. The Disorderly Conduct Regulation provides as follows:

> (a) A person commits disorderly conduct when, with intent to cause public alarm, nuisance, jeopardy or violence, or knowingly or recklessly creating a risk thereof, such person . . . []
>
> (2) Uses language, an utterance, or gesture, or engages in a display or act that is obscene, physically threatening or menacing, or done in a manner that is likely to inflict injury or incite an immediate breach of the peace.

36 C.F.R. § 2.34 (a) (2).[2] On this Count, Defendant argues that the words attributed to him are protected by the First Amendment and thus a conviction would be unconstitutional.

---

[1] "Kilroy" is the "name of a mythical person, popularized by U.S. servicemen [during World War II], who left such inscriptions as 'Kilroy was here' on walls, etc., all over the world." *Kilroy*, OXFORD ENGLISH DICTIONARY (2019).

[2] At the outset, Defendant's speech is not "obscene" or "done in a manner that is likely to inflict injury or incite an immediate breach of the peace." *See United States v. Lanning*, 723 F.3d 476, 480 (4th Cir. 2013) (quoting *Miller v. California*, 413 U.S. 15, 24 (1973) (material is "obscene" only if it "appeals to the prurient interest" and "depicts or describes, in a patently offensive way, sexual conduct")); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (the First Amendment does not "proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing *imminent* lawless action and is likely to incite or produce such action") (emphasis added). At oral argument, Defendant's counsel, relying on *Brandenburg*, argued that Defendant's alleged conduct is protected as mere advocacy. However, the statute at issue in *Brandenburg* explicitly targeted protected speech. That statute, unlike the Disorderly Conduct regulation, did not distinguish mere advocacy from incitement to imminent lawless action. Whether Brandenburg's speech was a "true threat" was not at issue. Here, the Government has not advanced an argument that Defendant's speech was "done in a manner that is likely to inflict injury or incite an immediate breach of the peace," instead arguing that Defendant's conduct amount to a "true threat." Thus, this decision will focus on whether Defendant's conduct was "physically threatening or menacing" within the meaning of the Disorderly Conduct regulation.

The protections afforded by the First Amendment, however, are not absolute. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-572 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been though to raise any Constitutional problem."). "True threats" are one of the limited classes of speech which government may regulate consistent with the Constitution. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) ("threats of violence are outside the First Amendment"). The Supreme Court has defined "true threats" as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 360 (2003) (internal quotations omitted). "The speaker need not actually intend to carry out the threat." *Id.* at 360. "Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders. *Id.* (citing *R.A.V.*, 505 U.S. at 388).

This Circuit uses a reasonable recipient standard for determining whether conduct amounts to a true threat. The test "is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury." *U.S. v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) (quoting *U.S. v. Davila*, 461 F.3d 298, 305 (2d Cir. 2006)). In general, "[w]hether a given writing constitutes a threat is an issue of fact []." *U.S. v. Malik*, 16 F.3d 45, 49 (2d Cir. 1994).

Here, the Information charges Defendant with "writing a racial slur" on "a signpost on the grounds of the African Burial Ground National Monument." (ECF 1). Whether the words Defendant wrote on the signpost constitute protected speech or a "true threat" cannot be determined from the Information alone. The parties have not stipulated to the material facts in

this case and there has been no proffer of evidence. Issues of fact remain on the content and context of Defendant's speech, for instance, the exact words written, the type of instrument used, and the size and location of the writing. Accordingly, dismissal of the Information is not warranted. *See United States v. Jordan*, No. 16 Cr. 93-G, 2017 WL 9516819, at *6 (W.D.N.Y. July 14, 2017) (denying motion to dismiss indictment because factual dispute existed as to whether Facebook post "Let's Start Killin Police Lets See How Dey Like It" was protected speech or "true threat"), *report and recommendation adopted*, No. 16 Cr. 93, 2017 WL 4784317 (W.D.N.Y. Oct. 24, 2017).

### III.     Conclusion

For the foregoing reasons, Defendant's motion to dismiss is DENIED.

**SO ORDERED.**

                                                  *s/ Ona T. Wang*

Dated: March 22, 2019                                          **Ona T. Wang**
        New York, New York                         United States Magistrate Judge