**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 10, 2019

**BY ECF (REDACTED) AND EMAIL (UNREDACTED)**
The Honorable Ona T. Wang
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Ivan Nieves*, No. 18 Cr. 835 (OTW)

Dear Judge Wang:

      The Government respectfully submits this letter in advance of the July 18, 2019 sentencing of defendant Ivan Nieves.  For the reasons set forth below, the Government respectfully submits that a sentence of at least 30 days' incarceration, to be followed by a period of probation, is necessary to serve the purposes of sentencing.

## I.  BACKGROUND

### A.  Offense Conduct

      On November 1, 2018, the defendant wrote "KILL N*****S" in large block letters across the face of a signpost at the African Burial Ground National Monument (the "Monument") using an oversized permanent marker.  (Presentence Report ("PSR") ¶ 9–10).  The Monument is a gravesite memorial to approximately 15,000 slaves whose remains were discovered in 1991 buried 30 feet beneath the streets of the City.  (PSR ¶ 13).  Research showed that those slaves in part built the early City of New York and were subject to incredibly harsh and inhuman treatment.  (*Id.*).  The sign the defendant vandalized using the threatening racial slur is entitled "A Place of Remembrance" and explains the significance of the memorial.  (*Id.*).  Trial testimony and video evidence established that during the approximately 90 minutes the vandalism was visible along a busy thoroughfare, it was seen by many passersby and Monument visitors, at least some of whom were disturbed and shaken by it.  (*See, e.g.*, Trial Tr. (Dkt. 45) at 16).

### B.  Non-Compliance with Bail Conditions

      The defendant was arrested on November 20, 2018 and presented before the Honorable Henry B. Pitman the same day.  (Dkt. 4).  The Court imposed an agreed-upon set of pretrial release conditions including, among other standard conditions, Pretrial Services supervision as directed and a mental health evaluation with treatment as directed based on that evaluation.  (Dkt. 4; Dkt. 5).

From the outset, the defendant repeatedly refused to comply with these conditions. On January 15, 2019, Pretrial Services submitted a memorandum to the Court advising that the defendant had failed to report to Pretrial Services as directed at least six times, had not been home for several prescheduled home visits, and had not submitted to a mental health evaluation.

On February 13, 2019, the Court held a status conference at which it impressed upon the defendant the importance of complying with his conditions of pretrial release, modified those conditions to include strict Pretrial Services supervision, and ordered the defendant to attend a mental health evaluation the following morning. (Dkt. 23).

On March 8, 2019, Pretrial Services submitted another memorandum to the Court advising that the defendant had violated the Court's orders by failing to attend the evaluation and failing to report to Pretrial Services as directed on two additional dates. Pretrial Services concluded that the defendant's bail should be revoked.

On March 15, 2019, the Court held a bail review hearing and decided that in the circumstances of this case, the most effective means of terminating the defendant's pretrial supervision would be to proceed promptly to trial. (Dkt. 33). The Court also ordered the defendant to proceed immediately to a mental health intake appointment upon conclusion of the conference, accompanied by his social worker. (Dkt. 42). After the hearing, upon reaching the lobby of the courthouse, the defendant refused to attend the intake appointment as ordered.

On March 20, 2019, another status conference was held at which the defendant refused in open court to comply with the Court's orders and conditions of pretrial release. (Dkt. 40 at 18–19).

On May 2, 2019, after the defendant was convicted at trial, he reported to the Probation Office to be interviewed in connection with preparation of the Presentence Report. At that time, the defendant was instructed to report to Pretrial Services immediately upon the conclusion of the interview, but he refused to do so and left the courthouse instead.

To date, the defendant continues to refuse to report to Pretrial Services and is in ongoing breach of his conditions of release pending sentencing.

## II.  DISCUSSION

### A.  Applicable Law

The defendant's conviction for vandalism under 18 U.S.C. § 1865(a) and 36 C.F.R. § 2.31(a)(3) is a Class B misdemeanor and carries a maximum term of imprisonment of six months, a maximum fine of $5,000, or both. *See* 18 U.S.C. §§ 1865(a); 3559(a)(7) (defining Class B misdemeanors); 3571(b)(6) (establishing maximum fines). The Court may also impose a term of up to five years' probation, *see* 18 U.S.C. § 3561(c)(2), which may be imposed in addition to— and to follow—a term of incarceration, *see* 18 U.S.C. § 3561(a)(3) (prohibiting probation only if defendant is sentenced to imprisonment on a felony or Class A misdemeanor); *United States v.*

*Posley*, 351 F. App'x 807, 809 (4th Cir. 2009).[1]  A term of probation can include conditions such as intermittent incarceration, confinement in a residential reentry center, home detention, a curfew, or community service.  *See* 18 U.S.C. § 3563(b).

The United States Sentencing Guidelines do not apply to Class B misdemeanors.  *See* U.S.S.G. § 1B1.9.

In determining an appropriate sentence, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), which provides that a sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and sets forth seven specific considerations:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

---

[1] For offenses of this type, the supervision to follow a term of imprisonment is referred to as probation, not supervised release.  As a technical matter, supervised release is prohibited by statute in this context.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Donovan*, No. 04 Cr. 1346 (MHD), 2005 WL 1322715, at *2 n.4 (S.D.N.Y. May 2, 2005).

### B.  The Court Should Impose a Sentence of At Least 30 Days' Incarceration

In this case, the nature and circumstances of the defendant's offense and the need to promote respect for the law, to provide just punishment, and to deter future criminal conduct all weigh heavily in favor of an incarceratory sentence, and the Government submits that a sentence of at least 30 days' incarceration is necessary to serve the purposes of sentencing.

*First*, an incarceratory sentence is necessary to reflect the seriousness of the defendant's criminal conduct and to provide just punishment.  *See* 18 U.S.C. § 3553(a)(2)(A).  The defendant's crime was far more serious than simple vandalism.  The defendant's offense was a hate crime.  He defaced a memorial burial ground to enslaved Africans by writing a racial slur and a threat to kill African Americans on it.  The location of the vandalism and the defendant's threatening message of hate were both chosen specifically to intimidate members of a racial minority, to maximize offensiveness, and to ensure that the message was seen by many.

Indeed, the Sentencing Guidelines reflect the relative seriousness of hate crimes by providing a three-level enhancement to the applicable offense level for any crime motivated by, among other things, the race or ethnicity of any person.  *See* U.S.S.G. § 3A1.1(a).  While the Guidelines do not apply in this case, the enhancement provides an important measure of the degree to which Congress and the Sentencing Commission view hate-motivated crimes as particularly serious.  In most situations, a three-level enhancement significantly increases the applicable Guidelines range.  This Court's sentencing discretion should be informed by the degree to which other offenders are punished when their crimes involve a hate-based motivation.

Similarly, the facts of this case make it one of the more egregious instances of misdemeanor-level (*i.e.* nonviolent, nondestructive) vandalism in a national park possible.  Congress has established a range of zero to six months' incarceration for this offense; it clearly intended the most serious such violations to be punished with a meaningful period of incarceration.  The defendant's conduct here falls on the more serious end of that spectrum.  A sentence of at least 30 days' incarceration would appropriately reflect the seriousness of the offense as compared to other instances of misdemeanor-level vandalism.

*Second*, an incarceratory sentence is also required to promote respect for the law and to afford adequate deterrence of future hate crimes of this type, both for the defendant specifically and for society in general.  *See* 18 U.S.C. § 3553(a)(2)(A), (B).  Hate-based vandalism is on the rise, both nationally and in the Southern District of New York in particular.  There has been a sharp increase in hate-crime vandalism in New York City recently, which makes up a large portion of the more than 180 hate crimes in the City during the first half of 2019—a 64% increase from the same period last year.  *See* Sharon Otterman, *Swastikas and Burning Pride Flags: Hate Crimes Spike in N.Y.*, N.Y. Times, June 5, 2019, available at https://www.nytimes.com/2019/06/05/nyregion/hate-crimes-rise-nyc.html (quoting NYPD statement that such vandalism should be treated "as seriously as we do an assault . . . because of the message of hate that it sends to all of the residents of the city.").  The defendant's crime has itself received public attention as part of this disturbing trend.  *See, e.g.*, Jake Offenhartz, *NYPD Blames 'Current Atmosphere' For Rise in Hate Crimes In NYC*, Gothamist.com, Nov. 7, 2018, available at

https://gothamist.com/2018/11/07/hate_crimes_rise_nyc.php (discussing the instant case against backdrop of "soar[ing]" hate crimes in New York City).

There is a serious need to send a strong, clear message—both to the defendant, who as discussed below has neither accepted responsibility nor expressed any remorse, and to other would-be hate-based vandals—that threatening and hate-based criminal conduct of this type is treated seriously and will result in more than a slap on the wrist. Whether in the form of swastikas on the side of synagogues, homophobic epithets at LGBT-owned establishments, or racial slurs on slave burial grounds, it must be made clear that hate crimes will not be tolerated in a modern civilized society.

*Third*, a sentence of at least 30 days' incarceration is also necessary to avoid unwarranted disparities among similarly situated defendants. *See* 18 U.S.C. § 3553(a)(6). Although cases of this type usually arise in state court, there is a distinct, though not exclusive, trend toward significant incarceratory sentences in cases involving similar hate-crime vandalism without violence, destruction of property, or other aggravating factors. This is true even where, unlike this case, the offender accepted responsibility, pled guilty, and expressed significant remorse for his conduct. For example:

- In 2018, a 19-year-old spray-painted swastikas and other Nazi symbols on the walls of a building at a Jewish cemetery in New York. He also deleted evidence of the crime from his friends' cell phones. He was sentenced to six months' incarceration plus 150 hours of community service. *See* Heather Yakin, *Warwick teen gets jail for vandalizing Jewish cemetery*, The Times Record-Herald, May 23, 2018, available at https://www.recordonline.com/news/20180523/warwick-teen-gets-jail-for-vandalizing-jewish-cemetery.

- In 2018, a 38-year-old man painted a swastika and an anti-Semitic slur on his neighbor's garage door in New York. The defendant was initially found not competent to stand trial, but after commitment and treatment was found competent and pleaded guilty. He was sentenced to six months' incarceration and five years' probation. *See* Frank Donnelly, *Man sentenced for hate crime for anti-Semitic scrawl on neighbor's garage door*, The Staten Island Advance, July 25, 2018, available at https://www.silive.com/southshore/2018/07/defendant_sentenced_for_hate_c.html.

- In 2015, a 44-year-old man with significant mental health issues wrote racist and xenophobic rants on the homes of four refugee families from the Congo and Rwanda in New Hampshire using a black permanent marker. He was sentenced to one year of incarceration and five years of probation. *See* Lynne Tuohy, *Man gets jail for writing racist graffiti on refugees' homes*, The Associated Press, Sept. 2, 2015, available via LexisNexis.

- In 2019, several teenagers spray-painted a substantial number of racial slurs and swastikas on their high school's grounds in Maryland. One defendant, who had also spray-painted a targeted racial slur against the black principal of the school, was sentenced to 54 days' incarceration to be served on consecutive weekends, plus 250

hours of community service and 3 years' supervised release.  Another defendant in the case, who was the most remorseful and was immediately cooperative and accepting of responsibility, was sentenced to 27 days' incarceration to be served on consecutive weekends, plus 250 hours of community service and 3 years' supervised release.  *See* Jess Nocera, *First teen sentenced in Glenelg hates crime case to serve 18 weekends in Howard County jail*, The Baltimore Sun, Mar. 8, 2019, available at http://www.baltimoresun.com/maryland/howard/ph-ho-cf-glenelg-shaffer-sentencing-0314-story.html; Jess Nocera, *Second teen in Glenelg High hate crime case sentenced to nine weekends in Howard County jail*, The Baltimore Sun, Mar. 22, 2019, available at http://www.baltimoresun.com/maryland/howard/ph-ho-cf-glenelg-seth-taylor-sentencing-0328-story.html.

These are just some examples of the cases showing that courts in New York and the surrounding area view hate-based vandalism as requiring incarceratory sentences, even in cases where mitigating factors exist.  In the absence of any unusual and significant mitigating factors in this case to justify creating such a disparity, the Court should take into consideration the sentences imposed on offenders who have committed similar crimes, so as to fulfill Congress's directive to avoid unwarranted sentencing disparities.

*Fourth*, the Court should also consider that—unlike the offenders in the cases referred to above—the defendant has not accepted responsibility, has not apologized, and has not expressed even the slightest remorse for his divisive and hateful criminal conduct.  To the contrary, the defendant's recalcitrance and continuing refusal to comply with the terms of his pretrial release and his threatened refusal to comply with future conditions of probation (discussed further below) demonstrate that he has no respect for the importance of taking responsibility for his actions.  The Court should sentence the defendant accordingly.

*Fifth*, nothing in the record suggests that the defendant's crime was caused by mental health issues or was motivated by anything other than racial animus.  The defendant has not submitted a mental health evaluation or provided any concrete evidence indicating that a mental health condition is a mitigating factor at all.  To the contrary, it is notable that the defendant's sentencing submission ██████████████████████████  There are no facts before the Court showing that mental health issues have anything to do with the defendant's conscious choice to deliberately write a threatening racial slur on a memorial to 15,000 enslaved Africans.  There is no indication that the defendant had anything less than a full and complete appreciation for the wrongful, hateful, and illegal nature of his actions.  The Government respectfully submits that, in the absence of concrete evidence, it should not be assumed from the limited data points in the record that any mental health issue the defendant may suffer from is a significant mitigating factor in this case.



Instead, the defendant argues only that ████████████████████████████████████████████ (Def.'s Sentencing Ltr. dated July 1, 2019 (filed under seal) at 1–3). ██████████████████████████ But it certainly does not excuse the defendant's ongoing refusal to comply with this Court's orders.  The Government respectfully submits that it would not be appropriate to reward

the defendant's obstinacy by omitting a condition of probation that the Court has concluded is otherwise appropriate.  Any period of probation should include as a condition that the defendant submit to a mental health evaluation and, depending on the results of that evaluation, participate in treatment therapy as directed by the Probation Office.

## III.  CONCLUSION

For the reasons set forth above, the Government respectfully submits that an incarceratory sentence is necessary to reflect the seriousness of the offense, to provide just punishment for this hate crime, to promote respect for the law, and to provide adequate deterrence to the defendant and other hate-motivated offenders.  The Government respectfully requests that the Court impose a sentence of at least 30 days' incarceration, to be followed by a period of probation.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: _____
Jacob R. Fiddelman
Assistant United States Attorney
(212) 637-1024

CC:    Philip L. Weinstein, Esq. (by ECF and email)